DYKE *v.* HOWE.

1. CANCELLATION OF INSTRUMENTS—DEEDS—INSANE PERSONS—IN-
   STRUMENT VALID IF PARTY MENTALLY COMPETENT AT TIME OF
   EXECUTION.

   If a person whose act is assailed was mentally competent at the
   time the instrument involved was executed, such instrument
   should stand, irrespective of the mental condition of the party
   either before or after the time of its execution.

2. SAME—MENTAL COMPETENCY ESTABLISHED BY EVIDENCE.

   In a suit to set aside a deed on the ground that grantor was
   mentally incompetent and was unduly influenced, evidence
   *held*, sufficient to affirmatively show that grantor was men-
   tally competent to execute the deed in question on the day it
   was executed, and that he was free from influence, due or
   undue, although shortly before his death he suffered a break-
   down which called for treatment.

Appeal from Clinton; Moinet (Edward J.), J.
Submitted April 10, 1928. (Docket No. 94, Calendar
No. 33,652.) Decided October 1, 1928.

Bill by Charles R. Dyke, administrator of the
estate of Frank A. Howe, deceased, and others
against Will V. Howe and others to set aside a deed.
From a decree dismissing the bill, plaintiffs appeal.
Affirmed.

*Smith, Hunter & Spaulding,* for plaintiffs.

*Raymond A. Latting* and *William C. Searl,* for
defendants.

FELLOWS, J.   This record of 519 pages containing
pleadings, exhibits, and the testimony of 55 wit-
nesses presents to this court a not uncommon situa-

As to capacity to make contract as affected by mental condi-
tion, see annotation in 3 L. R. A. (N. S.) 174.

6

tion, but one frequently brought to our attention, of relatives who during the lifetime of a decedent have done nothing for his welfare or comfort, insisting after his death that he did not have sufficient mental capacity to dispose of the property he had mental capacity to accumulate, and also insisting that those who have been kind, thoughtful, and considerate of his welfare in his lifetime and who have done something for him while he was here, have, during all the years, been but fraudulent connivers seeking only his property, guilty of fraud and undue influence in coercing him to disregard the statute of descent and leave his property to those who were close to his heart, to those of whom he was fond.

Decedent, Frank A. Howe, was the brother of defendant, Will V. Howe. He was 14 years his senior. He had never married, had lived at home until the death of his father, who seems to have been forehanded. Will also had remained at home although he was married. The home farm went to Will, and an 80-acre farm without buildings was willed to Frank. In a settlement with the other children, Frank bought 110 acres more without buildings and went into debt, as found by the trial judge, in the sum of $3,500, which indebtedness had been fully paid by him before his death. For around 17 or 18 years Frank lived with Will and his wife and their lands were worked together and their living came out of the common fund; they both seem to have prospered by the arrangements. Some seven years before his death Frank was under treatment at the Oak Grove sanitarium for several months, and, for about a month before his death, was confined in the Traverse City State hospital. He had a brother Clinton who had been there for a number of years, Will being his guardian.

This bill was filed to set aside a deed from Frank to Will and his wife, Grace, of his real estate, and for an accounting of the dealings between Frank and Will. The latter relief, however, was abandoned. Upon the hearing the plaintiffs without objection testified at length to facts which, if true, were equally within the knowledge of the deceased; some of the neighbors and acquaintances joined one side and some another, and the record presents the usual atmosphere common to cases of this character. We can not, of course, undertake a résumé of the testimony produced. We will call attention to some of it which will be illustrative, and, without stating in detail the claims of the parties, will announce our conclusions.

We are satisfied that Frank was neither subnormal nor mentally incompetent during his entire life, as claimed by some of the plaintiffs and their witnesses. He was a plodding, hard working farmer. He was undoubtedly possessed of a nervous temperament, and no doubt suffered a breakdown necessitating the ten months of treatment at the sanitarium some seven years before his death, at a cost of approximately $2,000. We are likewise satisfied that he suffered another breakdown shortly before his death, which occurred in March, 1925. But the testimony of the witnesses on both sides, we think, establishes that he possessed sufficient mentality to meet in the main the tests laid down by this and other courts. While plaintiffs and their witnesses entertain the view that he was mentally incompetent, practically every one of them testify that he knew what property he possessed, its value, who his relatives were, and their relations to him. This is illustrated by the testimony of Dr. E. M. Paine, for which much is claimed by plaintiffs. The doctor was

called November 8th in the nighttime, when Frank had a spell. He treated him off and on thereafter until he went to the asylum. In answer to a hypothetical question, he testified to Frank's mental incompetency, and expressed a like opinion from his personal contact with him. On cross-examination, he testified:

"I was there about three-quarters of an hour, and the next time I saw him was at the office and we talked.

"*Q.* And did he answer your questions intelligently?

"*A.* So far as I remember, fairly so. I talked with him each time he was at the office.

"*Q.* I am not confining it particularly to the office, I am asking you if at each of the other times you saw him, whether at the office or where it was, up to the time he was taken away, whether he answered your questions intelligently, if you asked him any?

"*A.* If I remember, it was sufficiently intelligent, except he was a little bit talkative.

"*Q.* At each of the times you saw him after November 8th until he was taken away and talked with him, if you did ask him any questions, he answered them intelligently each time, didn't he?·

"*A.* I wouldn't say. That is my recollection. All I have is a general recollection. I couldn't say that I remember any occasion when he didn't answer my questions intelligently.  *  *  *

"*Q.* And.those are the times you are describing, that every time you talked with him or saw him he understood his relatives and all about his property?

"*A:* Yes.

"*Q.* So, in your judgment, if he had desired to sit down and think over what he should do with his property, and his relatives, he would have sufficient mind to do that?

"*A.* I think he might, and that he might know his relatives and how they were related to him."

In cases too numerous to cite we have held that if the person whose act is assailed was mentally competent at the time the instrument involved was executed, such instrument should stand, irrespective of the mental condition of the party either before or after the time of its execution. We, therefore, take up the facts bearing on the execution of the deed. Frank was acquainted with Harry H. Partlow, an attorney of standing in Lansing. They were both born and brought up in Eagle township, Clinton county, and Mr. Partlow still owned a farm not far from the Howes' home. About a year before his death, and in the spring of 1924, Frank saw Mr. Partlow on the street in Lansing and told him he wanted him to prepare some papers for him. In June Frank and Will both came to Mr. Partlow's office. Frank told him he wanted Will to have the farm when he was done with it and Will was to assure him a home for the balance of his life. Frank did not want to execute the deed that day, as he wanted Mr. and Mrs. Moore, whom he had known for 20 years, to act as witnesses, and they were unable to come that day. Mr. Partlow prepared the deed to Will and Grace. In it the possession, use, etc., of the land was reserved to Frank during his lifetime, and the grantees covenanted to furnish him a home during the balance of his life. Whether Mr. Partlow then delivered the deed to Frank or mailed it to him later, Mr. Partlow is unable to state. But Frank had it and kept it in his safety deposit box at the bank. On December 20th, Frank got the deed, and in company with Mr. and Mrs. Moore went to Mr. Partlow's office. He was not in, and while waiting for him they all signed it. When he came in he

took the acknowledgment, asked Mr. and Mrs. Moore to step out and talked fully with Frank about the transaction. He saw nothing in Frank indicative of mental incapacity, and the talk with Frank satisfied him that Frank was acting freely, and that there was no reason to question the transaction. The deed was left in escrow with Mr. Partlow to be delivered on Frank's death. Will was not present in Mr. Partlow's office that day, although he came to Lansing with Frank. We do not share in the view of plaintiff's counsel that the testimony of Mr. and Mrs. Moore is untruthful and should not be considered. We discover no reason for disregarding it. Their testimony fully corroborated that given by Mr. Partlow, and, if believed, sustained the mental capacity of Frank on that day and sustained the validity of the deed.

But in addition to this proof, defendants called as a witness a Mr. Shadduck, a perfectly disinterested witness, a friend of Frank for 20 years, who testified that he met Frank on the street in Lansing this day, and that Frank told him he had just fixed his property, had given it to Will and Grace, that Mr. Partlow had made the papers, that it was just as he wanted it, and that he had anticipated doing it before. Other testimony is satisfying that Frank had for many years entertained an intent to give his property to Will and his wife when he was through with it.

One of the plaintiffs, a sister of Frank and Will, produced in court a box of rubbish made up largely of paper clippings which Frank had cut out from time to time and brought one time to her house. She definitely fixes the date it was brought there as before Christmas, and there is much corroborative proof that he brought it there at the time she claimed.

Will's family admit that Frank did get to cutting out clippings from papers, catalogues, etc., but fix the time of such conduct at a later date, when he did so to relieve his nervous condition. The box of clippings was much paraded until one of defendants' counsel discovered, and called the attention of every one to the fact, that in this box of clippings was one from a Lansing paper bearing date February 5, 1925. This sustains defendants' contention that a later date than before Christmas was the actual date when Frank was employing himself in cutting out pieces from the paper. Instead of sustaining plaintiffs' claim that Frank's final breakdown occurred before Christmas and before the deed was executed, it sustains defendants' claim that the occurrence was of a later date.

It is apparent that there came a time when Frank needed treatment. In February Will signed a petition which had been prepared to place Frank in the State hospital at Traverse City. It recited Frank was insane, and set forth acts which tended to sustain such conclusion. Later he also signed a petition for the appointment of a guardian with like allegations. These petitions were admissions of Will against interest, and were evidence against him of a high order. They did not bind Grace, nor did they estop Will from contending to the contrary. After Frank had the "spell" in November, Dr. Paine on two different occasions tried to get Frank into the psychopathic ward at Ann Arbor for treatment. Both efforts failed, due to the overcrowded condition there. Later it was decided that he should go to Traverse City. Frank himself talked with a friend about it, said he was going there for treatment, and discussed it sanely and rationally. There is much testimony in the case tending to show that, notwith-

standing the proceedings and order of commitment, he was even at that time mentally competent. But we are not concerned so much about his mental condition at this date as we are about it on the date the deed was executed. We should give these admissions against interest their due weight, but if we are satisfied on the whole record that Frank was mentally competent when he executed the deed, we ought to so hold. We are so satisfied and do so hold.

We have noted the fact that Will was guardian for his brother Clinton, who was made a defendant. As such guardian, in an answer he submitted his ward's rights to the court. It would have been better had Will resigned as guardian. But we can not see that these appealing plaintiffs are harmed by his failure so to do. As between Will and Clinton, Will would have the burden of proof on the question of undue influence. This does not inure to the benefit of these plaintiffs. But this is of little moment here, as we reach the conclusion after a careful reading of this record and the excellent briefs, that it affirmatively appears that Frank A. Howe was mentally competent to execute the deed in question on the day it was executed, and that he was then free from influence, due or undue, exerted by defendants or any one else.

The decree will be affirmed, with costs.

Fead, C. J., and North, Wiest, Clark, McDonald, Potter, and Sharpe, JJ., concurred.